IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 26, 2018

**STATE OF TENNESSEE v. SHANNON HANEY**

**Appeal from the Circuit Court for Cocke County**
**No. 5831     Rex H. Ogle, Judge**

———————————————————

**No. E2018-00085-CCA-R3-CD**

———————————————————

Shannon Haney, Defendant, was convicted of sexual battery. The trial court sentenced him, as a career offender, to six years in the Tennessee Department of Correction with release eligibility after service of sixty percent of the sentence. On appeal, Defendant argues that the evidence was insufficient for a rational juror to have found him guilty of sexual battery beyond a reasonable doubt. He also asserts that the trial court erred by denying his motion to strike an exhibit from the record that was not moved into evidence by the State. After a thorough review of the record and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Edward Cantrell Miller, District Public Defender; and Keith E. Haas, Assistant District Public Defender, for the appellant, Shannon Haney.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Jimmy B. Dunn, District Attorney General; and Tanya D. Thornton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

On September 3, 2014, the Cocke County Grand Jury indicted Defendant for two counts of rape and one count of sexual battery by an authority figure.

At trial, K.T.,[1] the victim, testified that Defendant dated her mother, Wendie Gilliam, "off and on for about six years." During that time, Defendant lived in the same house with K.T., Ms. Gilliam, and Ms. Gilliam's infant child, K.G.[2] In 2013, Ms. Gilliam worked the night shift, and Defendant watched K.T., who was fourteen, and K.G. K.T. admitted that she frequently "got into trouble" by sneaking out, driving Ms. Gilliam's vehicle, and smoking. To punish K.T., Ms. Gilliam took away her phone and non-essential possessions and grounded her. K.T. stated that she had a boyfriend named Jessie Cate[3] that Ms. Gilliam did not know about. On August 3, 2013, Ms. Gilliam left for work with K.T.'s aunt. Defendant also left the house. K.T. decided to meet Jessie at a nearby church. K.T. left K.G. at the house alone.

When K.T. returned to her residence, Defendant's vehicle was pulling into the driveway. K.T. hid behind a bush to avoid Defendant, who pulled back out of the driveway and spoke to Jessie. When K.T. approached her residence, Defendant was waiting outside and asked K.T. where she had been and with whom. K.T. went into the residence, and Defendant asked for her phone so that he could call Ms. Gilliam and tell her that K.T. had left the house. K.T. asked Defendant not to tell Ms. Gilliam and stated that she would "do anything" to ensure that Defendant did not tell. In response, Defendant pulled on K.T.'s shorts and said, "[Y]ou'll do anything[?]" Defendant then informed K.T. that he was going to a store to purchase a condom.

Defendant left the residence, and K.T. called her friend Alexis. K.T. then drove Ms. Gilliam's vehicle to Alexis' residence, picked her up, and took her to the Gilliam residence. Defendant had not returned to the residence when K.T. and Alexis arrived. Later, K.T. and Alexis returned to Alexis' residence, and K.T. returned to her residence alone; Defendant had not returned to the house when she arrived. K.T. stated that she went to her bedroom and lay down on her bed. When Defendant returned, he came into K.T.'s bedroom and asked her to come into the kitchen. K.T. informed Defendant that she did not want to have sex with him. K.T. entered the kitchen, and Defendant started pulling on her hands to move her into Ms. Gilliam's bedroom. Defendant pushed K.T. into Ms. Gilliam's bedroom and onto the bed. K.T. testified that she tried to get off the bed, but Defendant pushed her back down and pulled off her shorts. Defendant was on top of K.T. and used his knees to open her legs. K.T. could not move because of

---

[1] It is the policy of this court to refer to a minor victim of a sex crime by her initials only. We intend no disrespect.

[2] We will also refer to Ms. Gilliam's other minor child by his initials to protect his identity. We intend no disrespect.

[3] Initially, K.T. testified that Jessie was seventeen at the time of the offenses. Later, on cross-examination, K.T. agreed that Jessie was eighteen at the time of the offenses.

Defendant's body weight. K.T. felt Defendant's penis penetrate her vagina. Eventually, K.T. felt Defendant's weight move, and she pushed him off of her. Defendant ejaculated on her "chest area and lower neck." K.T. returned to her bedroom, took off the shorts and bra that she was wearing, and put on a robe. K.T. stated that, during the offense, Defendant forced her to perform oral sex on him by pushing her head onto his penis, but she could not remember when this occurred.

The next morning, K.T. went to a birthday party with her friend Peyton. Defendant was at the residence when she left, and Ms. Gilliam was asleep. While K.T. was at the party, Ms. Gilliam called her and asked who she had slept with.[4] K.T. told Ms. Gilliam that Defendant raped her. Ms. Gilliam picked up K.T. and brought her to her aunt's house. Later, a detective spoke with K.T. at her aunt's home and picked up her shorts and bra from the Gilliam residence.

On cross-examination, K.T. agreed that, in her statement to Detective Travis Webb given the day after the offense, she omitted that she picked up Alexis in Ms. Gilliam's vehicle on the night of the offense and that she went to a birthday party on the day after the offense. K.T. stated that, after the offense, a doctor examined her, and she had no physical injuries to her genitals.

Detective Webb testified that, in August 2013, he worked for the Cocke County Sheriff's Office. Detective Webb began his investigation of the case by speaking with K.T. and Ms. Gilliam. Detective Webb and Ms. Gilliam went to the Gilliam residence, and Detective Webb retrieved the clothing that K.T. stated that she wore during and after the offense. Detective Webb explained that he later returned to the Gilliam residence to obtain a pink shirt that K.T. said she used to wipe semen off her chest; he identified Exhibit 1 as the pink shirt that he retrieved. He also interviewed Defendant, who gave the following statement:

> On 8/3/13, I was taking a shower to go to town. [K.T.] left around 9:00 p.m. I left around 9:15 p.m. and went riding around in [Ms. Gilliam's] car. After riding around, I swapped cars around 12:00 a.m., maybe possibly 1:00 a.m. I borrowed my aunt's car from Jones Hill. When I got home, I heard the baby crying for ten minutes. I kept knocking on [K.T.]'s door but no one answered. I tried opening the door with a clothes hanger. I finally found a pair of red scissors. When I finally got in the door, [K.T.] wasn't in the room but [K.G.] was in the room. I got [K.G.] and I went to the living room and got [K.G.] calmed down. After [K.G.] went to sleep, I went back outside and noticed where she had opened the window. I knew

---

[4] The record is unclear why Ms. Gilliam asked K.T. this question.

if she seen [sic] [Ms. Gilliam's] car she wouldn't come home so I moved it near the neighbor's house. I seen [sic] a young boy so I hollered at him and asked him if he had seen [K.T.] or did he know [K.T.]. He said he didn't know any [K.T.]. I went back inside to check on [K.G.]. [K.G.] was still asleep. When I came back out, I seen [sic] a shadow walking. I walked to the corner of the house where she tried getting back in the window. I confronted her, asking her what she was doing sneaking out of the house. She shouldn't be leaving [K.G.] at home alone. She said she couldn't be getting in any more trouble. She had just got out of trouble. I told her to give me her phone, I was going to call her mother. She stated she wouldn't give me the phone. She said if I said anything, I would never see my son again. She told me this several times. I told her not to be leaving [K.G.] alone like that. I laid down around 2:30 or 2:45. About forty-five minutes, I heard a car crank and leave. She came back about fifteen minutes. She had a blonde girl with her, Lexie. I asked her what she was doing, to take that girl back home. She told me she had picked her up because her and her mom were arguing. She said something about her mom being on crack. I told her to take her back home. I laid back down. That was the last time I seen her.

Detective Webb stated that he arrested Defendant after he "received the DNA results stating that [Defendant's] sperm was a match for the sperm found on the clothing." On cross-examination, Detective Webb stated that K.T. did not initially inform him that she left the Gilliam residence to visit her friend Alexis on the night of the offense or that she wiped semen off her chest with a shirt.

Special Agent Jennifer Millsaps testified that she worked as a forensic scientist for the Tennessee Bureau of Investigation ("TBI") at the Knoxville Regional Crime Laboratory. Special Agent Millsaps examined the bra, underwear, robe, and shirt that Detective Webb collected from the Gilliam residence. She found sperm and non-sperm DNA on the bra, underwear, and shirt. The non-sperm DNA on the items was consistent with a mixture of K.T. and Defendant's DNA. The sperm DNA on the items matched Defendant. Special Agent Millsaps did not find sperm on the robe, so she did not continue testing that item. On cross-examination, Special Agent Millsaps agreed that she could not determine how Defendant's DNA was deposited on the items that she tested. She was not familiar with testing for "condom trace evidence." She explained that the TBI does not "do any testing for anything like that from a condom for lubricants or anything of that nature."

Peyton Douglas testified that she went to school with K.T. and was a close friend with K.T. from eighth grade through tenth grade. Ms. Douglas stated that she and K.T.

would spend the night at each other's residences and would shop together. Ms. Douglas agreed that K.T. told her "things about boys that [K.T.] didn't tell her mama[.]" In July and August 2013, Ms. Douglas stated that K.T. was dating Jessie Cate. She also stated that, during that summer, she and K.T. would sometimes leave their houses and go to parties. Late in the evening of August 3, 2013, K.T. called Ms. Douglas and told her that K.T. and "somebody else" had taken Ms. Gilliam's vehicle and were leaving to attend a party. K.T. told Ms. Douglas that Defendant had caught K.T. as she was leaving and that K.T. and [Defendant] had an agreement "that if she slept with [Defendant] that he wouldn't tell her mother." Ms. Douglas recalled attending a birthday party with K.T. on August 4, 2013. That afternoon, Ms. Gilliam called K.T. and told K.T. that she was coming to pick her up. Ms. Douglas said that K.T. was upset and was "freaking out[.]" Ms. Douglas agreed that, during this time period, K.T. was known to lie about leaving her residence and that she was frequently in trouble. Ms. Douglas testified that Defendant was never at the Gilliam residence when she spent the night there.

Alexis Meeks testified that she attended the same school as K.T. from elementary school through freshman year of high school. Ms. Meeks was friends with K.T. During the summer of 2013, she and K.T. would ride around in Ms. Gilliam's vehicle. She agreed that K.T. was seeing Jessie Cate. In the late evening of August 3, 2013, or early morning of August 4, K.T. picked up Ms. Meeks because "[Ms. Gilliam's] boyfriend was trying to make [K.T.] do things with him and . . . she was scared and . . . she wanted to come pick [Ms. Meeks] up." Ms. Meeks told K.T. that she could come over to the Meeks' residence and spend the night. When Ms. Meeks and K.T. arrived at the Gilliam residence around 1:00 a.m., Defendant was sitting on the couch in the residence. Ms. Meeks did not observe Defendant act inappropriately with K.T. or say anything sexually suggestive. Ms. Meeks asked K.T. to take her home, and she again offered to let K.T. spend the night at her house. K.T. drove Ms. Meeks home but declined to spend the night.

Before submitting the case to the jury, the trial court dismissed count three of sexual battery by an authority figure, finding that the evidence did not establish that Defendant was an authority figure to K.T. or that there was more than one act of sexual contact. Following deliberations, the jury found Defendant not guilty of rape in count one. In count two, the jury convicted Defendant of the lesser-included offense of sexual battery. The trial court sentenced Defendant, as a career offender, to six years in the Tennessee Department of Correction with release eligibility after service of sixty percent of the sentence. Defendant filed a timely motion for new trial, which the trial court denied. Defendant now timely appeals.

## II. Analysis

### *Sufficiency of the evidence*

Defendant contends that, based on the verdicts, the jury determined that Defendant did not orally rape K.T. in count one and that Defendant did not force K.T. to have sexual intercourse in count two. Additionally, Defendant argues that "[t]here was zero testimony of any intentional touching of the alleged victim's intimate parts by [Defendant] or of the [Defendant] by the alleged victim or of the clothing immediately covering those intimate parts." Thus, Defendant maintains that the evidence was insufficient to convict him of sexual battery in count two. The State responds that "[t]he jury's verdict [wa]s consistent with a finding that . . . [D]efendant touched [K.T.'s] vaginal area without penetration."

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As applicable to this case, sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "[f]orce or coercion is used to accomplish the act[.]" Tenn. Code Ann. § 39-13-505(a)(1) (2013). Coercion is defined as "threat of kidnapping, extortion, force or violence to be performed immediately or in the future or the use of parental, custodial, or official authority over a child less than fifteen (15) years of age[.]" Tenn. Code Ann. § 39-13-501(1) (2013). Force "means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title[.]" Tenn. Code Ann. § 39-11-106(12) (2013).

Sexual contact "includes the intentional touching of the victim's[] [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's[] [or] the defendant's[] . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Tenn. Code Ann. § 39-13-501(6) (2013). "Intimate parts" includes the following: "semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Tenn. Code Ann. § 39-13-501(2) (2013).

When the evidence is viewed in the light most favorable to the State, we conclude that a rational juror could have found Defendant guilty of sexual battery beyond a reasonable doubt in count two. K.T. testified that, during the offenses, Defendant's body was on top of hers, and she was unable to move. He pushed K.T. onto the bed, pulled off her shorts, and forced her legs open. K.T. was only able to get up from the bed and push Defendant away once Defendant's body weight shifted off of K.T. Because the trial court instructed the jury that sexual battery can occur by either force or coercion, the jury could have relied on either factor to find Defendant guilty. This evidence was sufficient to support the jury's finding that Defendant committed unlawful sexual contact with K.T. through force or coercion.

Additionally, the evidence was sufficient for the jury to find that Defendant intentionally touched K.T.'s intimate parts for the purpose of sexual gratification. K.T. testified that, when she came home from visiting Jessie Cate, Defendant pulled at her shorts and left the residence to purchase a condom. When Defendant returned, he pulled K.T. from the kitchen into Ms. Gilliam's bedroom and pushed K.T. onto the bed. Defendant used his knees to open her legs, and K.T. felt Defendant's penis penetrate her vagina. Defendant then ejaculated on her neck and chest. Additionally, K.T. testified that Defendant forced her to perform fellatio on him. Further, the offenses occurred while Ms. Gilliam was at work. Defendant's actions of leaving to purchase a condom, forcing K.T. onto the bed, holding her on the bed, and ejaculating on her provided ample evidence for the jury to have inferred that Defendant's sexual contact with K.T.'s intimate parts was intentional and for the purpose of sexual gratification. Defendant is not entitled to relief on this ground.

### Denial of Defendant's motion to strike

Defendant argues that the State did not properly authenticate K.T.'s clothing items because Ms. Gilliam did not testify regarding her handling of the evidence. Defendant also asserts that the State did not move the clothing exhibits into evidence, and therefore, Exhibits 1 and 2 should have been stricken from the record. The State initially responds that Defendant's arguments are waived because Defendant did not make a contemporaneous objection to the State's alleged failure to move the items into evidence,

and Defendant did not specifically include his chain of custody argument in his motion for new trial.  Further, the State asserts that Defendant is not entitled to plain error relief because "[t]he record indicates that the identity and integrity of the evidence were reasonably established."

The following exchange occurred during K.T.'s direct testimony:

[THE STATE:] All right, [K.T.].  He's going to show you some things.  I want you to see if you can identify them.  Okay?

[K.T.]. (Witness nods head up and down.)

[THE STATE]. We've got a pink shirt.  Does that look familiar?

[K.T.]. Yes.

[THE STATE]. Is that your shirt?

[K.T.]. Yes.

[THE STATE]. Was this a shirt that you had on that day, or why does the officer have this shirt?  Do you remember?

[K.T.]. I don't remember.  I don't recall wearing it.

[THE STATE]. Okay.  But at some point, someone gave that to the officer, correct?

[K.T.]. Yes.

[THE STATE]: The pink shirt is in a bag by it itself, Your Honor.  I would like to mark it as Exhibit 1.

THE COURT: You may.

(Pink shirt in bag was entered into evidence as Exhibit No. 1.)

[THE STATE]. Then the next bag, can you identify the item that he's showing you there?

[K.T.]. Those were the shorts that I was wearing the night.

[THE STATE]. Those were the shorts you had had on when this happened?

[K.T.]. Yes.

[THE STATE]. All right. And then there's a couple of other items in that bag. Do you recognize that?

[K.T.]. Yes, that was the bra that I was wearing.

[THE STATE]. Then there's one more item, I believe, in there. Do you recognize that?

[K.T.]. That is the robe that I had put on after I had took [sic] off the bra.

[THE STATE]. So the three items that he just showed you are all items that you were either wearing during when this happened or right after this happened; is that correct?

[K.T.]. Yes.

[THE STATE]: We would like to move to mark that bag with all three items, Your Honor, as Exhibit 2.

THE COURT: You may.

(Bag with three clothing items was entered into evidence as Exhibit No. 2.)

After the State rested its case-in-chief, Defendant moved to "to exclude all of the clothing that's been marked as Exhibits 1 and 2 that's never been entered into evidence[.]" Defendant argued that:

the pink shirt was opened and exhibited to [K.T.] and she identified it. It was put back in the bag and was never introduced into evidence by the State. Exhibit 2 had been opened. Detective Webb, or Officer Webb, showed the boxers, the bra and the robe to [K.T.]. It was placed back in the bag and was never introduced into evidence. There's a big gap on a chain

of custody. If you don't have those items, then there's no proof to go before this jury[.]

The following exchange then occurred:

THE COURT: Well, based upon the fact that the witness was examined about it by both the State and the defense, the Court finds that any failure as to that, first of all, it was exhibited in open court in front of the jury, and she was asked about it repeatedly. The fact that maybe --Well, actually was it marked?

[THE STATE]: Yes, Your Honor.

THE COURT: Yes, the clothes were marked as an exhibit.

[DEFENDANT]: Marked, but never asked to be entered.

THE COURT: Well, it was testified about and there was no objection to the testimony, and it was certainly not contemporaneous, and so the Court overrules that motion.

Later, defense counsel made the following statement pertaining to this issue:

The reason I didn't object, [K.T.] identified the exhibits, but I knew the mother had touched the pink tee-shirt, which was Exhibit 1, and so I was going to object to the chain of custody if they moved to introduce with a later witness, thinking it would be Mr. Webb because he collected the evidence, and he never was moved to ask at that point. So when the Court ruled that my objection was not contemporaneous, it wasn't moved to be introduced through [K.T.] and then they never asked through Mr. Webb who collected the evidence, and I was waiting to object for the chain of custody to have the mother have to testify. And I just wanted to make sure the record is clear that's why I didn't object at the time, because I didn't want to . . . reveal my hand at that point.

Initially, we must address the State's waiver argument. The State correctly notes that Defendant did not argue in his motion for new trial that Exhibits 1 and 2 should have been stricken from the record because the State failed to fully establish the chain of custody. Additionally, the trial court concluded the exhibits were, in fact, marked and entered as exhibits, and the record reflects Defendant did not make a contemporaneous

- 10 -

objection that chain of custody had not been established or that the State failed to properly move to admit the exhibits into evidence.

Tennessee Rule of Appellate Procedure 3(e) states "that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence[] . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). "The failure to make a contemporaneous objection constitutes waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). We determine that Defendant has waived plenary consideration of his chain of custody and admission of evidence arguments because he failed to make a contemporaneous objection to the State's introduction of the evidence and failed to include the chain of custody issue in his motion for new trial. *See State v. Nathaniel T. Williams*, No. M1999-00790-CCA-R3-CD, 2001 WL 637698, at *5 (Tenn. Crim. App. June 11, 2001) (concluding that the defendant waived review of the State's improper introduction of an exhibit by failing to object during trial), *perm. app. dismissed* (Tenn. Oct. 1, 2001; *State v. Jody Sweat*, No. E2000-02472-CCA-R3-CD, 2001 WL 1134604, at *10 (Tenn. Crim. App. Sept. 26, 2001) (concluding that the defendant waived review of admission of several exhibits because "[t]he defense failed to make a contemporaneous objection at the time the state submitted the items at issue"), *no perm. app. filed*; *State v. Richard Allen Kidd, II*, No. 03C01-9607-CC-00272, 1997 WL 789909, at *4 (Tenn. Crim. App. Dec. 23, 1997) (finding that "that the defendant waived any objection to the irregularity [of admission of exhibits] to the extent contemporaneous objections were not interposed to the state's motions to publish the exhibits to the jury"). However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010).

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for

- 11 -

plain error relief).  When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors.  *Smith*, 24 S.W.3d at 283.  The defendant bears the burden of persuasion to show that he is entitled to plain error relief.  *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

*State's failure to move Exhibits 1 & 2 into the record*

In *Richard Allen Kidd, II*, this court set out the best practice for admitting evidence into the trial record:

> An attorney who wants to introduce an exhibit at trial should (a) ask the court reporter or other court officer to mark the exhibit for identification (exhibits should be marked numerically and sequentially without reference to the proponent); (b) show the exhibit to adversary counsel (this should be reflected in the record), thereby giving him the opportunity to raise objections before foundation questions and answers suggest inadmissible matter; (c) either obtain the court's permission to approach the witness to deliver the exhibit for his inspection, or, if required by court rule, ask that a court official present the exhibit to the witness; (d) lay the proper foundation for the admission of the exhibit, including proof of authenticity (in doing so, leading questions are appropriate because laying a foundation is a preliminary matter); and (e) then request that the exhibit be introduced into evidence.

1997 WL 789909, at *3-4 (citing Lawrence A. Pivnick, *Tennessee Circuit Court Practice* § 24-12, at 703-04 (4th ed. 1995)).

We conclude that Defendant is not entitled to plain error relief on this ground. While the State did not strictly comply with the suggested procedure set out in *Richard Allen Kidd, II*, we conclude that the State **did** move for admittance of Exhibits 1 and 2 into evidence.  The record reflects that the State asked the trial court "to mark [the pink shirt] as Exhibit 1."  The record then reflects that the "[p]ink shirt in bag was entered into evidence as Exhibit No. 1."  Additionally, the State "move[d] to mark that bag with all three items[] . . . as Exhibit 2."  The record reflects that the "[b]ag with three clothing items was entered into evidence as Exhibit No. 2."  Thus, the State moved to admit Exhibits 1 and 2 into evidence, and the trial court admitted the exhibits into the record. Therefore, Defendant has not established that a clear and unequivocal rule of law was breached by the trial court's denial of his motion to strike Exhibits 1 and 2 from the record.  *See Nathaniel T. Williams*, 2001 WL 637698, at *5 (concluding that "the ambiguity surrounding the introduction of the autopsy report, and the confusion in the marking of the exhibits to the trial, d[id] not constitute the breach of 'a clear and

unequivocal rule of law'" and thus, "any irregularity in the admission of the autopsy report d[id] not rise to the level of plain error"); *see also Richard Allen Kidd, II*, 1997 WL 789909, at *4 (concluding that the irregular admission of evidence was neither an abuse of discretion nor reversible error).

*Chain of custody*

Tennessee Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a).  The Tennessee Supreme Court has previously recognized that it is "well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody." *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (internal quotes omitted).  The purpose of the chain of custody requirement is "to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)).

Even though each link in the chain of custody should be sufficiently established, Rule 901(a) does not require that the identity of tangible evidence be proven beyond all possibility of doubt; nor is the State required to establish facts which exclude every possibility of tampering.  *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (citing *Scott*, 33 S.W.3d at 760).  "[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.*  In addition, the State's failure to call as a witness each person who handled an item does not necessarily preclude the admission of the evidence.  *Id.*  Absent sufficient proof of the chain of custody, however, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." *Scott*, 33 S.W.3d at 760 (quoting Cohen et. al., *Tennessee Law of Evidence* § 901.12, at 624 (3d ed. 1995)).

Here, we conclude that Defendant is not entitled to plain error relief on this ground.  A clear and unequivocal rule of law was not breached by the admission of Exhibits 1 and 2 because "the facts and circumstances that surround[ed] [Exhibits 1 and 2] reasonably establish[ed] the identity and integrity of the evidence[.]" *See Cannon*, 254 S.W.3d at 296.

### III. Conclusion

We conclude that evidence presented at trial was sufficient for a rational juror to have found Defendant guilty of sexual battery beyond a reasonable doubt. Additionally, we conclude that Defendant is not entitled to plain error relief based on the admission of Exhibits 1 and 2 into evidence and the trial court's denial of his motion to strike those exhibits. We affirm the trial court's judgment.

_____
ROBERT L. HOLLOWAY, JR., JUDGE